IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVIDT NATHAN WITHERN,
aka RUSSELL D. BURGESS,
aka RUSSELL A. BURGESS,
aka DAVID STAR WINTERZ,

    Petitioner,

vs.

EDWARD S. ALAMEIDA,

    Respondent.

No. CIV S-03-0588 JAM EFB P

FINDINGS AND RECOMMENDATIONS

    Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 2000 judgment of conviction entered against him in Sacramento Superior Court on charges of first degree murder with an enhancement for use of a knife.  He seeks relief on the ground that he was mis-identified as the perpetrator and is factually innocent of the crime.  Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

////

////

1

# I. Procedural and Factual Background[1]

> A jury convicted defendant Russell D. Burgess of first degree murder (Pen. Code, §§ 187, subd. (1), 189; further undesignated statutory references are to the Penal Code) and found he personally used a knife in the commission of the offense (§ 12022, subd. (b)(1)). In a bifurcated proceeding, the jury found defendant was sane at the time of the offense. He was sentenced to state prison for one year plus a consecutive indeterminate term of 25 years to life.
>
> * * *
>
> FACTS
>
> *Guilt Phase*
>
> On January 10, 1999, at around 7:00 a.m., West Sacramento police arrested defendant for breaking into and vandalizing a church. He appeared to be under the influence of alcohol but did not appear to be mentally ill. He possessed property indicating that he had also broken into a real estate office near the church. After being advised of his rights, he admitted breaking the window of a car. When he was booked into Yolo County Jail, he was wearing Airwalk tennis shoes and was in possession of an empty knife sheath.
>
> Four days later, Volunteers of America workers examined an area beneath the L Street onramp to Interstate 5 in Sacramento where homeless people sometimes sought shelter. They found a man covered by a blanket and determined that he was dead. Police were called and directed to the body.
>
> The deceased was identified as Robert Trobal, a homeless man. A pathologist estimated Trobal had been dead for two to three days before he was found. He had suffered 29 separate stab wounds. Some were "defensive" wounds on his hands and forearms. Others were to his chest, back, sides, neck, and head. At least two were probably inflicted postmortem.

////

---

[1] The following summary is drawn from the August 14, 2001 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), lodged in this court on January 27, 2005, as "Item No. 4." This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). Petitioner has not overcome the presumption with respect to the underlying events. The court will therefore rely on the state court's recitation of the facts.

Numerous shoeprints were found around the body. Officers spent weeks trying to identify shoeprints, including one set that appeared to be tennis shoes.

On May 3, 1999, Sacramento police received their first lead in the case. An attorney informed a detective that she "had a possible witness" in the case. Officers interviewed the "witness," Mark Smith, aged 19, who directed them to the scene of the homicide and furnished details about the crime. Smith directed officers to West Sacramento, where he pointed out a church, a real estate office and a damaged car. Smith also directed officers to a "salvage yard," where they looked for a knife and recovered a shirt. As a result of the contact with Smith, officers obtained from the West Sacramento Police Department the Airwalk tennis shoes defendant was wearing at the time of his January arrest.

Defendant was arrested pursuant to a warrant on May 31, 1999. The next morning, Detective Gene Burchett conducted a videotaped interview of him.

At the outset, defendant stated he had "been crying a lot lately," because his girlfriend had broken up with him. After discussing the breakup, defendant gave Burchett some background information on him and his family. Burchett stated he wished to talk to defendant about something "that happened back in January" to a "guy under the freeway." He suggested the matter "has probably been on [defendant's] mind for a while," and that he might want to "clean something up or to come to terms" with it. Burchett confirmed defendant had been advised of his constitutional rights before, and then advised him of his rights. Burchett asked defendant if he understood his rights. Defendant made eye contact with Burchett and shook his head "that he understands the right."

Defendant initially claimed he was "really intoxicated" the night he was arrested in West Sacramento and he remembered nothing that happened earlier that night. Burchett said Smith had put most of the blame on defendant for a murder "under the freeway." Burchett also said defendant's shoe prints were found near the body. Defendant said he was "schizophrenic" and delusional, and had been so since, as a child, his maternal aunt had put "crank" in his coffee. He was 18 years old, suffered from "self-hatred," attempted suicide on several occasions, practiced self-mutilation, had an anger control problem, especially when intoxicated, and was supposed to take an "[a]nti-psychotic" drug. He had not taken his medication for several months preceding his January arrest; after the arrest, he resumed taking his medication.

Burchett told defendant "being in denial and refusing" to "come to term with" events such as the stabbing "causes problems for [him] internally," that "denying that this thing happened" is "not a good

3

thing for" him, and that when he "talk[s] about the truth," "that's when things start turning around for" him. Before the January arrest, defendant then said, he and his friend Mark "[g]ot good and drunk" in Old Sacramento and "started breaking things." He claimed that every time he and Mark socialized, they would "get drunk or smoke weed. And one of us will come up with a crazy idea, beating someone up for their bikes or whatever."

Burchett told defendant that he and Mark were visible on videotape from the security camera in the pedestrian undercrossing between the K Street Mall and Old Sacramento.[2] At that point, defendant said that on the night in question, Mark suggested they "shank someone," and he "guessed" he "agreed." They were near the undercrossing when they decided to "just shank" Trobal. They approached Trobal, who was lying down, and asked him for a cigarette. Trobal stood up and said he had none. Mark stabbed Trobal first, perhaps in the chest, and then defendant stabbed him, perhaps in the lungs. Trobal "was in pain and went down." Defendant did not remember stabbing Trobal after he went down. After the murder, defendant and Mark stole and consumed alcohol from the Delta King, then walked back to West Sacramento where defendant broke into the church and got arrested. Defendant must have lost the knife, which he kept in a sheath on his belt, before his arrest. He realized he "did something bad" and "wanted to put that night behind" him. Until he resumed his medication, he "wanted to die because of what [he] did." He was wearing his "Airwalk" tennis shoes at the time of the murder.

At the time of trial, Mark Smith was incarcerated for his part in the killing. Smith testified defendant woke up Trobal and asked him for a cigarette. Feeling threatened, Trobal stood up and "tried to throw a punch" at defendant. Defendant "pulled his knife and started stabbing" Trobal in the chest or stomach. For a reason Smith could not explain, he then pulled out his own knife and stabbed Trobal twice in the "mid to lower back area." Trobal groaned and hunched or crouched down. Defendant stabbed Trobal twice in the head and he fell to the ground. Defendant grabbed Trobal by the wrists and dragged him to the location by a fence where he was found. Then defendant straddled Trobal and stabbed him in the head, ribs, side, and stomach. At that point, Trobal was not moving at all.

Shaundra Richard, age 18, testified she was a friend, but not a girlfriend, of defendant. She met defendant on West Capitol Avenue on the afternoon of January 9, 1999. They had coffee, and defendant described "how he wanted to get a job and change his life." They went to the motel where she lived with her mother and

---

[2] This was untrue, because the videotape obtained by the officers was from the day the victim's body was discovered, not the day the murder occurred.

4

siblings. Defendant got some alcohol and they got drunk and played video games. Shaundra fell asleep at about 11:00 p.m. When she awoke at 5:00 a.m. the next morning, defendant was there; he left shortly thereafter.

Shaundra was familiar with defendant's handwriting and identified him as the author of some writing found in his backpack ("Senseless Event," "Bed of Tomb," "Unanswerable Feat," "Repentance of a Man"). Shaundra also identified a letter defendant wrote to her from Sacramento County Jail, dated April 3, 2000, in which he stated he did not know if she "should testify for" him, and he was "thinking about just pleading guilty" because he was "tired of living a lie."

The defense presented two stipulations and rested without calling any witnesses.

*Sanity Phase*

It was stipulated that the jury could consider the guilt phase evidence without limitation during the sanity phase. The only witness was defendant. He kneeled and prayed before taking the witness stand. He claimed his first and last name was "Rust."

Defendant recalled watching his videotaped interview with the police. He was depressed and under the influence of LSD and Sudafed at the time of the interview. He was in a state of "fantasy" and saw the detective as his "best friend Mark." He did not "really" recall the night of the crime. He wrote Exhibit 42, "Unanswerable Feat," while in jail in Yolo County. It was a song about a vampire and had nothing to do with the victim in this case. Exhibit 43, "Repentance of a Man," was a song about Christianity and "[s]elf [-] damnation" or "self [-] mutilation," which he used to practice. He claimed that, from 1995 to 1998, he practiced demonic rituals. Exhibit 504, another writing found in his backpack on the themes of murder and death, had nothing to do with the charged crime. Defendant became preoccupied with death and dying around 1995, about a year after he started using street drugs, which was "the beginning of [his] loss of sanity." Exhibit 39, defendant's letter to Shaundra, was written in response to letters he received from her informing him that he was with her at the time of the murder. He attributed his statements in the letter suggesting that he might quit lying and plead guilty to the fact that he had frequently been accused of doing things that he had no knowledge of doing. Thus, if someone says he did something, he tends to believe it. Another writing from defendant's backpack illustrated his belief in "past life regression," in which he had been alive as a vampire in the "mid thirties" and knew Adolph Hitler. Defendant is part German and has a "very deep morbid fascination" with Hitler. Defendant's writings were his "work" and his "life" as a "musician/writer." He described his writings as

5

"demented," which was "[g]ood to [him]," but "crazy to others. When others call him crazy he "blow[s] it off like a compliment." He has attempted to become a Christian since December 1998, and he has renewed that goal since his most recent incarceration. He is currently taking "[p]syche meds" that make him feel like "[k]ind of like a zombie" but "seem to help."

On cross-examination, defendant admitted that he was looking for a job the morning before the murder. However, his behavior was not normal; it was a "[d]ecoy." He denied running from police in West Sacramento, and claimed they "pulled up in front of" him. He remembered watching the videotape of his interrogation but did not remember the interview itself. When he said during the interrogation that he stabbed the victim 10 to 15 times, he was just agreeing with the officer and said the first numbers that came into his head. He admitted that he had anger control problems when he got drunk. He denied that the killing of the victim, a homeless man, was reflected in his writings. He explained that Jesus Christ was "pretty much homeless" and was "rejected by all his own family," but defendant "still love[d] him." Defendant claimed it was Smith who "always wanted" to commit crimes, and defendant would "just go along with it." He admitted belonging to a "white pride" group that hated "[e]veryone" who was not Aryan. Smith was a member of this group. Defendant did not know why he went "along with" Smith's idea to "shank someone;" defendant probably was talking to himself and might have misunderstood Smith. When asked why he admitted to the officer that he committed the murder, defendant responded, "Why not. I'm already dead. What's my life had to do with that. What am I gonna do. Where am I going. I ain't going nowhere." However, upon further questioning, he admitted that he had not given up on life. Defendant claimed that he had been under the L Street onramp days before the murder and had seen "some bum" there who he guessed was the victim. During the interrogation he "was depicting that very place," which he guessed was the crime scene. He used witchcraft, or communication with the dead, to do "seances" with Smith and learn from Smith's memory, which evidently held knowledge of the murder. His expressions of remorse during the interrogation were "about [him]self." He admitted stabbing the victim because he had a "false memory" of the killing. He was "playing games" with the officer, who he thought was Mark. He wrote to Shaundra from Sacramento County Jail promising to marry her even though he was in love with another girl because he "tell[s] people what they want to hear," not because he wanted Shaundra to provide him an alibi. In another letter he wrote that a psychiatrist had interviewed him; he added, "I hope she doesn't think I'm too looney. If so, I won't be going to prison. I'll be in an insane asylum." In another letter to Shaundra defendant asked rhetorically, "What do I got. A mental disorder. No alibi." Defendant admitted a trial that he was "basically thinking out loud to her." He considered blaming Mark

6

>for the killing but "just said the hell with it. They think they got me. You know. Well, let them get me." Defendant was "accepting [his] role as the damned. Not accepting [his] role as a murderer."

Opinion at 1-10.

Using the name Russell D. Burgess, petitioner filed a timely appeal of his conviction. He claimed that "the trial court erred by (1) finding that he knowingly, intelligently and voluntarily waived his *Miranda* rights, and (2) instructing the jury at the sanity phase that the word 'wrong,' as used in CALJIC No. 4.00 on '[d]istinguishing right from wrong,' 'means both legally wrong and morally wrong.'" Opinion at 2. The state appellate court affirmed petitioner's judgment of conviction in its entirety in an unpublished opinion dated August 14, 2001. *Id.* Petitioner subsequently filed a petition for review in the California Supreme Court, also using the name Russell D. Burgess. Respondent's Lodged "Item No. 5." That petition was summarily denied. *Id.*

On May 8, 2003, again using the name Russell D. Burgess, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, claiming that he had been "framed" by Mark Smith for the murder of Trobal. Respondent's Lodged "Item No. 6." On July 18, 2003, petitioner filed a letter in the California Supreme Court, in which he explained that he had been wrongfully identified as Russell Burgess, that his true name was "Davidt Star Winterz," that the May 8, 2003 habeas petition had been filed by another inmate without petitioner's knowledge, and that he was innocent of the murder of Trobal. Respondent's Lodged "Item No. 7." On August 24, 2003, the California Supreme Court wrote a letter to petitioner, advising him that he could strike the May 8, 2003 petition by making a check mark in the appropriate space on the court's letter to him. Respondent's Lodged "Item No. 8." However, rather than asking to have the petition stricken, petitioner wrote another letter to the California Supreme Court, requesting that additional allegations be added to the petition. Respondent's Lodged "Item No. 9." In that letter, petitioner identified himself as "Russell Winter . . . also known as David Star Winterz."

7

*Id.* Petitioner stated that he was innocent and he identified the perpetrators of the murder as "Mark Alan Smith, and his friend, Jarrod Lemelin." *Id.* By order dated January 14, 2004, the California Supreme Court denied petitioner's habeas petition, citing *In re Lindley*, 29 Cal.2d 709 (1947) and *In re Dixon*, 41 Cal.2d 756 (1953). Respondent's Lodged "Item No. 10."

Petitioner filed the instant petition in the United States District Court for the Southern District of California on February 27, 2003. The petition was transferred to this court on March 21, 2003. Respondent filed an answer on January 27, 2005, and petitioner filed a traverse on February 11, 2005.[3]

## II. Analysis

### A. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

---

[3] After his original petition and traverse were filed in this court, petitioner filed four more documents purporting to be amended habeas petitions, another traverse, and several letters. All of these documents essentially repeat or elaborate on the claims made in the originally filed petition. Although the court has read and considered all of these filings, the petition filed February 27, 2003 is the operative pleading in this matter. On March 26, 2008, petitioner filed a document in this court and in the Court of Appeals for the Ninth Circuit entitled "Abandonment of Petition; Petition for Review; Motion to File Successive Petition." On May 14, 2008, the Ninth Circuit issued an order in response to this filing, in which the court denied as premature petitioner's request to file a successive habeas petition, and informed petitioner that if he wished to withdraw the instant habeas petition he was required to file a motion for voluntary dismissal in the district court. Petitioner did not file a motion for voluntary dismissal.

set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

**B. Petitioner's Claims**

Petitioner's claims are difficult to decipher. Although he purports to raise four separate claims, the gist of his allegations is that he is factually innocent of the murder of Trobal.[4] Petitioner's first "claim" is that he was wrongfully identified by the trial court as the suspect in the murder of Trobal. Pet. at 6. His second "claim" is that he was wrongfully arrested even

---

[4] Indeed, respondent has construed and addressed petitioner's four articulated claims as stating a single freestanding claim of actual innocence. Answer at 3. Petitioner does not object to this characterization of his claims in the traverse.

9

though the police did not have his correct name and/or that the police replaced his identification card with the identification of another person (Russell Burgess) who was suspected of the murder of Trobal. *Id.* at 7. Petitioner's third "claim" is that he falsely confessed to the murder of Trobal because he was intoxicated with LSD and was therefore "influenced to believe that I had done this crime." *Id.* at 8. Petitioner's fourth "claim" is that Mark Allen Smith wrongfully identified him as the perpetrator of the murder because of a "deal" Smith made with the District Attorney's office, and because Smith knew petitioner "had the ability to turn him in for the murder, coincidentally." *Id.* at 9. Because each of his claims address the same common allegation that he is factually innocent of the murder, the court construes his allegations as a single claim of freestanding actual innocence. However, to the extent the petitioner is attempting to assert other claims, the court also addresses other claims that might be suggested by petitioner's allegations.

### C. Procedural Default

As described above, the California Supreme Court denied petitioner's habeas petition filed in that court, citing *In re Lindley*, 29 Cal.2d 709 (1947) and *In re Dixon,* 41 Cal.2d 756 (1953). Respondent argues that the court's citation to these two cases constitutes a procedural bar which precludes this court from addressing the merits of petitioner's claim of actual innocence. Answer at 7. Respondent also urges this court to deny petitioner's claim on the merits. *Id.* at 10.

State courts may decline to review a claim based on a procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977). As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The state rule is only "adequate" if it is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 424

1  (1991)).  *See also Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed
2  adequate, the state law ground for decision must be well-established and consistently applied.")
3  The state rule must also be "independent" in that it is not "interwoven with the federal law."
4  *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S.
5  1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the claims may be
6  heard if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the
7  alleged violation of federal law; or (2) that failure to consider the claims will result in a
8  fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 749-50.  Procedural default is an
9  affirmative defense, and the state has the burden of showing that the default constitutes an
10 adequate and independent ground.  *Insyxiengmay v. Morgan*, 403 F.3d 657, 665-66 (9th Cir.
11 2005); *Bennett*, 322 F.3d at 585-86.

12      *In re Dixon* "bars a habeas corpus petitioner from raising a claim that was not, but should
13 have been, raised on appeal." *In re Seaton*, 34 Cal.4th 193, 199 (2004).  The California Supreme
14 Court's citation to *In re Dixon* does not constitute an adequate and independent procedural rule.
15 The *Dixon* bar may be "independent" as applied in this case. *See Bennett*, 322 F.3d at 581-83.
16 However, respondent has not met his burden of demonstrating that the *Dixon* bar is "adequate,"
17 having been regularly and consistently applied in habeas actions post-1993.[5] *Id.* at 583-86. *See*
18 *also Wyrick v. Newland*, No. C 03-5623 JSW, 2007 WL 760529, at *5-6 (N.D. Cal. Mar. 9,
19 2007) (rejecting argument that citation to *Dixon* constituted adequate procedural bar and finding
20 that the state had failed to meet its burden of proof under *Bennett* of establishing the adequacy of
21 the procedural bar to preclude federal review).  Accordingly, the California Supreme Court's
22 citation to *In re Dixon* does not constitute a procedural bar to federal review of petitioner's
23 claims.

---

[5] The Ninth Circuit has held that the *Dixon* procedural bar was not firmly established and consistently applied at least prior to 1993 and therefore cannot constitute an independent and adequate state procedural bar prior to that time. *See Cooper v. Calderon*, 255 F.3d 1104, 1111 (9th Cir. 2001); *Fields v. Calderon*, 125 F.3d 757, 765 (9th Cir. 1997).

11

The California Supreme Court also cited *In re Lindley* in denying petitioner's habeas petition. *Lindley* holds that habeas corpus is not ordinarily available to retry issues of fact or the merits of a defense, the sufficiency of the evidence, evidentiary rulings, or other procedural errors. 29 Cal.3d at 723. However, petitioner's claim, as stated in his state habeas petition, does not appear to involve sufficiency of the evidence, evidentiary rulings by the trial court, errors of procedure, or merits of a defense. Thus, the meaning of the Supreme Court's order and citation to *Lindley* is not entirely clear. "[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review." *Calderon*, 96 F. 3d at 1131 (quoting *Morales v. Calderon*, 85 F. 3d 1387 (9th Cir. 1996) (citing *Siripongs v. Calderon*, 35 F.3d 1308, 1317 - 18 (9th Cir. 1994). In any event, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *see also Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004). Under the circumstances presented here, this court finds that petitioner's claim of actual innocence can be resolved more easily by addressing it on the merits. Accordingly, this court will assume that petitioner's claim is not defaulted and will address it on the merits.

**D. Claim of Actual Innocence**

As explained above, petitioner has articulated four claims that, in essence, constitute one claim that he has been wrongfully convicted of the murder of Trobal because he is innocent of that crime.

In *Herrera v. Collins*, 506 U.S. 390 (1993), a majority of the Supreme Court assumed, without deciding, that a freestanding claim of actual innocence is cognizable under federal law. In this regard, the court observed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. A different majority of the Supreme Court explicitly held that a freestanding claim of

12

actual innocence is cognizable in a federal habeas proceeding. *Compare* 506 U.S. at 417 with 506 U.S. at 419 and 430-37. *See also Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) (noting that a majority of the Justices in *Herrera* would have supported a free-standing claim of actual innocence). Although the Supreme Court did not specify the standard applicable to this type of "innocence" claim, it noted that the threshold would be "extraordinarily high" and that the showing would have to be "truly persuasive." *Herrera*, 506 U.S. at 417. More recently, the United States Supreme Court declined to resolve whether federal courts may entertain independent claims of actual innocence but concluded that the petitioner's showing of innocence in the case before it fell short of the threshold suggested by the Court in *Herrera*. *House v. Bell*, 547 U.S. 518, 554-55 (2006). Finally, in *District Attorney's Office for Third Judicial Dist. v. Osborne*, ___U.S.___, 129 S.Ct. 2308 (2009), the Supreme Court has recently again assumed, without deciding, that a federal constitutional right to be released upon proof of "actual innocence" exists. In doing so, the court noted that it is an "open question" whether a freestanding claim of actual innocence exists and that the court has "struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." *Id.* at 2321.

      The Ninth Circuit has assumed that freestanding innocence claims are cognizable in both capital and non-capital cases and has also articulated a minimum standard of proof in order to prevail on such a claim. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). "A habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* at 476-77. *See also Jackson*, 211 F.3d at 1165. The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. at 417).

      Assuming arguendo that a freestanding claim of innocence may be maintained in this non-capital case, petitioner has failed to make the required showing. Petitioner's unsupported

13

allegations that he was wrongfully accused by Mark Smith and that the police and trial court mis-identified him as Russell Burgess, the alleged perpetrator, do not constitute a "truly persuasive demonstration" that he is innocent of the murder of Trobal. *Herrera*, 506 U.S. at 417. Accordingly, petitioner is not entitled to relief on his claim of actual innocence.

**E.  Other Claims**

Petitioner's allegations arguably give rise to several other federal constitutional claims. It is not clear whether these claims have been exhausted in state court. However, as set forth below, notwithstanding the exhaustion requirement, this court will recommend that petitioner's additional claims be denied on the merits. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

**1.  Sufficiency of the Evidence**

Petitioner may be claiming that the evidence at his trial was insufficient to support his conviction. There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).

As related by the state appellate court, petitioner admitted to stabbing Trobal when questioned by the police. He was in possession of an empty knife sheath at the time of his arrest, and the shoes he was wearing matched the shoeprints found at the scene of the crime. Mark Smith's description of his and petitioner's involvement in the crime matched the description given by petitioner during his interrogation. Both men's descriptions matched the actual wounds inflicted on Trobal. Viewing this evidence in the light most favorable to the verdict, there was sufficient evidence from which a reasonable trier of fact could have found beyond a reasonable

doubt that petitioner was guilty of the murder of Trobal. Accordingly, the decision of the state court that sufficient evidence supported petitioner's murder conviction is not contrary to federal law and may not be set aside.

### 2. Unlawful Arrest

Petitioner appears to be arguing that his arrest was unlawful because the police did not know his true identity. Arguably, petitioner is claiming that the state trial court erred by admitting evidence obtained as a result of the arrest. The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). There is no evidence before the court that petitioner did not have a full and fair opportunity to litigate a Fourth Amendment claim in state court. Accordingly, the claim is also barred in this federal habeas proceeding. *Stone*, 428 U.S. at 494.

### 3. Involuntary Confession

Petitioner claims that he was under the influence of LSD when he made his confession to the police. Arguably, this constitutes a claim that his confession was involuntary.

The Fourteenth Amendment to the United States Constitution demands that confessions be made voluntarily. *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972). A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)). *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A statement may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect and a free will. *Gladden v. Unsworth*, 396 F.2d 373, 380-81 (9th Cir. 1968). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Collazo v. Estelle*, 940 F.2d 411,

15

1  416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  In
2  the end the court must determine under the totality of the circumstances whether "the
3  government obtained the statement by physical or psychological coercion or by improper
4  inducement so that
5  the suspect's will was overborne."  *Beatty v. Stewart*, 303 F.3d 975, 992 (9th Cir. 2002) (quoting
6  *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).
7        Petitioner claims that he has a history of drug use and that he may have "hallucinated" his
8  guilt of the murder, causing him to confess.  Pet. at 8.  These vague allegations do not establish
9  that petitioner's confession was involuntary.  Aside from petitioner's unsupported claims, there
10 is no evidence before the court that petitioner was suffering the effects of LSD intoxication at the
11 time of his interrogation by the police, that the police knew he was under the influence of LSD,
12 or that his mental state caused him to falsely confess.  The fact that petitioner may have been
13 under the influence of LSD does not alone render his confession involuntary.  *See Colorado v.*
14 *Connelly*, 479 U.S. 157, 165 (1986) ("while mental condition is surely relevant to an individual's
15 susceptibility to police coercion, mere examination of the confessant's state of mind can never
16 conclude the due process inquiry"); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000)
17 (heroin withdrawal and physical discomfort not enough to establish involuntariness of
18 confession).  Further, "coercive [police] activity is 'a necessary predicate' to finding a
19 confession involuntary."  *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992), *disapproved*
20 *on other grounds, United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997).  There is no
21 evidence in this case that the police obtained petitioner's confession by the use of improper
22 tactics.  In short, the record does not support a finding of an involuntary confession.
23 Accordingly, any such claim should be denied.
24 ////
25 ////
26 ////

1    For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: January 25, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE